# EXHIBIT A

Jason A. McNeill (9711)
mcneill@mvmlegal.com
Kennedy D. Nate (14266)
nate@mvmlegal.com
MCNEILL | VON MAACK
175 South Main Street, Suite 1050
Salt Lake City, Utah 84111
Telephone: 801.823.6464

Attorneys for Plaintiffs Ron and Donna
Ingram

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH (Southern Region)

| | |
|---|---|
| **RON INGRAM, an individual, and DONNA INGRAM, an individual,** | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| **Plaintiffs,** | |
| **v.** | |
| **CHRIS COPELAND CONSTRUCTION, INC., a Utah corporation, and CHRIS COPELAND, an individual,** | |
| **Defendants.** | **Case No. 4:20-cv-00004-DN**<br>**Judge David Nuffer** |

---

Plaintiffs Ron Ingram and Donna Ingram (collectively "Plaintiffs" or the "Ingrams"),

through counsel MCNEILL VON MAACK, allege and complain against Defendants Chris Copeland

Construction, Inc. ("CCC") and Chris Copeland ("Copeland") (collectively, "Defendants") as

follows:

### NATURE OF THE ACTION

1.      In this diversity action, Plaintiffs seek damages based on Defendants' breach of a

construction agreement, breach of the covenant of good faith and fair dealing, and negligence in

causing additional damage to Plaintiffs' property.

## PARTIES

2.      Plaintiff Ron Ingram is an individual domiciled in Henderson, Nevada.

3.      Plaintiff Donna Ingram is an individual domiciled in Henderson, Nevada

4.      Defendant Chris Copeland Construction, Inc. ("CCC") is a Utah corporation with its principal place of business located at 2551 West 3750 North, Cedar City, Utah 84701.

5.      Defendant Chris Copeland ("Copeland") is an individual who, upon information and belief, is domiciled in Cedar City, Utah.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiffs seek actual damages in excess of $75,000, exclusive of interests and costs. There is complete diversity between the parties. Plaintiffs are domiciled in Nevada. Defendant Copeland is domiciled in Utah and Defendant CCC is a citizen of Utah, which is where it is incorporated and where its principal place of business is located.

7.      This Court has personal jurisdiction over Defendants because they are citizens of this District and are domiciled in this District. Defendants are also conducting business in this District, including by entering into a contract in this District with Plaintiffs for construction related services to be rendered on real property located in this District.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because Defendants reside in this District and the events giving rise to Plaintiffs' claims arose in this District.

## FACTUAL ALLEGATIONS

### The Construction Agreement

9.      Plaintiffs are semi-retirees who have acquired various properties in Duck Creek Village, Utah.

10.     Many of Plaintiffs' properties are used for vacation rentals when they are not being used by Plaintiffs' children, grandchildren, and friends.

11.     Plaintiffs' properties are being used in part to help fund their retirement.

12.     In 2018, Plaintiffs decided to construct a new cabin on one of their properties that would become Plaintiffs' dream retirement home.

13.     The property at issue is located at 3750 North, Movie Ranch Road, Duck Creek, Utah (the "Property").

14.     Plaintiffs conducted substantial due diligence in researching potential contractors in the area to assist them with this construction.

15.     Plaintiffs had much of the initial construction work on the Property performed by Cedar Mountain Builders, who was hired to dig and pour the footings, lay the underground plumbing, install the septic system, and pour the concrete floor and garage.  However, Plaintiffs were looking to hire a different contractor to complete the finish work on their dream retirement home.

16.     Plaintiffs learned about CCC and Copeland from various local advertisements and contacted Copeland to discuss working on the Property.

17.     After negotiations and discussions regarding the work needing to be performed, CCC provided Plaintiffs with a proposal to perform the finish work on Plaintiffs' Property.

3

18.     CCC submitted a proposal to perform construction related services on the Property for a total cost of $64,700.

19.     On November 4, 2018, Plaintiffs and CCC entered into a construction agreement (the "Construction Agreement") wherein CCC agreed to provide construction related services to Plaintiffs, including by "rough framing the basement walls, first floors and walls, loft floor and walls, roof framing, posts, beams, and decks…stacking of log kit, labor, tools, pneumatic nails / staples, and forklift services." [Construction Agreement, at 1, Exhibit "1".]

20.     In exchange for these services, Plaintiffs agreed to pay CCC $64,700 in three separate installments:  an initial down payment of $32,350 and two subsequent payments of $16,175 each after the completion of certain portions of the Property.   [*Id.*]

21.     Under the terms of the Construction Agreement, CCC was to begin construction on the Property after receiving the initial down payment and finish completion of the Property to the second floor.

22.     Upon completion of the second floor of the Property, CCC would then be entitled to a second payment in the amount of $16,175.

23.     After completion of the project in its entirety, Plaintiffs would pay the remaining $16,175 to CCC.

24.     After signing the Construction Agreement, Plaintiffs wired the down payment of $32,350 to CCC's bank in Cedar City, Utah.

25.     CCC confirmed receipt of the wire and informed Plaintiffs that it would begin construction on the Property immediately.

### CCC Fails to Perform Under The Construction Agreement

26.     Although Plaintiffs satisfied their contractual duties through transmittal of the down payment, CCC failed to hold up its end of the bargain almost from the start of the contractual relationship.

27.     Despite promising to start construction on the project immediately, CCC failed show up for days at a time to perform the work.

28.     Specifically, CCC promised that it would have the exterior logs installed on the Property no later than two weeks after receiving the down payment.

29.     CCC failed to install the exterior logs within the two weeks it had promised.

30.     After failing to install the exterior logs, CCC stopped showing up to work on the Property for weeks at a time.

31.     Plaintiffs repeatedly contacted CCC and Copeland to find out when CCC would return to work on the Property.

32.     Defendants promised to return to the Property within days but either did not show up when promised or failed to perform any substantial work on the Property when CCC appeared.

33.     In or around January 2019, CCC spent 4 days removing snow and billed Plaintiffs $3,085 for the snow removal.

34.     CCC claimed the snow removal was necessary to allow CCC to continue construction on the Property.

35.     Plaintiffs initially objected to paying for the snow removal but ultimately paid the bill for snow removal, reserving all rights to recover the payment if CCC did not perform, in an

attempt to incentivize CCC to continue its work. Plaintiffs reserved their rights to demand repayment of the snow removal costs if CCC failed to continue working on the Property.

36.     Despite receiving payment for the snow removal, CCC did not return to work on the property for days, rendering the snow removal totally unnecessary.

37.     In performing the snow removal, CCC also damaged the logs and other finishing materials that it had left out exposed to the elements.

38.     In performing the snow removal, CCC also damaged the deck piers by hitting them with machinery, damaging them, and knocking them out of plumb.

39.     In performing the snow removal, CCC also pushed rocks onto the septic tank, which had not yet been covered, causing damage to the tank and additional expenses to later remove the rocks.

40.     CCC never fully installed the exterior logs on the Property.

41.     CCC never fully finished rough framing the basement walls.

42.     CCC never fully finished framing the first floors and walls.

43.     CCC never fully finished framing the roof or installing the posts

44.     CCC failed to fulfill any of its obligations under the agreement.

**Plaintiffs Terminate the Construction Agreement**

45.     After months of trying to get CCC to show up and work on the Property, Plaintiffs sent a letter to CCC on July 2, 2019, outlining the damage done and Plaintiffs' concerns with CCC's non-performance. [*See* 7-2-19 Letter R. and D. Ingram to C. Copeland ("July Letter"), Exhibit "2".]

46. In the July Letter, Plaintiffs pointed out that it had been nearly 8 months since CCC had been hired and CCC had not completed any of the work under the Construction Agreement.

47. Plaintiffs also pointed out that they had incurred substantial costs to have snow removed based on CCC's representations that it would be coming to work on the Property only to have CCC not show up.

48. Plaintiffs informed CCC that its non-responsiveness and continued delays were causing damage to Plaintiffs, including by causing Plaintiffs to incur substantial interest fees on their loan.

49. Plaintiffs informed CCC that if it did not start working on the Property again, they would terminate the Construction Agreement.

50. By September 2019, CCC had failed to finish any of the work required under the Construction Agreement.

51. On September 7, 2019, and after months of delay and non-progress on the construction of the Property, Plaintiffs terminated the Construction Agreement. [*See* 9-7-19 Letter R. and D. Ingram to C. Copeland (the "Termination Letter"), Exhibit "3".]

**CCC Damages the Property and Fails to Perform its Work in Workman-like Manner**

52. After terminating the Construction Agreement with CCC, Plaintiffs discovered substantial damage to their Property caused by CCC.

53. CCC left Plaintiffs' exterior logs uncovered and exposed to the elements, resulting in significant damage to the logs and requiring substantial work to repair the logs.

7

54.     For the logs that were stacked by CCC, the logs were not stacked properly and the cope for many of the logs was short by as much as 2 inches.

55.     Plaintiffs also discovered that CCC had used improper joists at the south end of the Property and also in the garage.

56.     The floor in both areas was sagging due to the improper joists and required significant work and expense to fix.

57.     The framing that CCC did install in the basement was not done properly and needed to be corrected, resulting in significant expenses for labor and materials.

58.     CCC also failed to correctly install microlam above the garage door.

59.     CCC also failed to correctly place the hold downs in the basement.

60.     Each of the aforementioned errors were in breach of the Construction Agreement and caused damage to Plaintiffs such that Plaintiffs were required to retain a new contractor to fix CCC's unworkmanlike work.

### CCC and Copeland Are Alter Egos

61.     Based on publicly available filings, Copeland is the sole shareholder, director, and officer of CCC.  CCC is therefore a one-man corporation.

62.     Upon information and belief, CCC was and has continued to be undercapitalized since its creation.

63.     Upon information and belief, CCC has failed to observe corporate formalities, including by failing to hold shareholders' or directors' meetings, the making of decisions by Copeland as if he was a partner, and Copeland acting as if he and CCC are one and the same.

64.     Upon information and belief, Copeland has siphoned corporate funds for his own use and has treated all assets of CCC as his own personal assets.

65.     Upon information and believe, Copeland has used CCC has a façade for his personal operations, including by using corporate funds to pay personal expenses without proper accounting, commingling of personal and corporate funds, and failing to maintain complete corporate and financial records.

66.     To fail to treat CCC and Copeland as being alter egos would lead to inequitable results.

67.     Based on the foregoing allegations, CCC and Copeland are alter egos of each other and are joint and severally liable for each other's debts.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

68.     Plaintiffs hereby incorporate by reference the allegations contained in the above paragraphs.

69.     Defendants and Plaintiffs entered into the Construction Agreement, which is a valid and enforceable contract between the parties.

70.     Plaintiffs performed all of their obligations under the Construction Agreement as set forth above, including by paying CCC the initial $32,350 down payment.

71.     Defendants materially breached the Construction Agreement, including by failing to perform the work contemplated under the Construction Agreement, failing to perform the work in a workmanlike manner, and causing damage to the Property while Defendants were located on the Property.

72. Defendants' actions also constituted a breach of the implied warranties inherent in the Construction Agreement, including as set forth in Utah Code Ann. section 78B-4-513.

73. Plaintiffs have been damaged in an amount to be determined at trial, but in amount of not less than $99,087.87, and, to the extent applicable, interest, costs, and attorney fees.

## SECOND CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

74. Plaintiffs hereby incorporate by reference the allegations contained in the above paragraphs.

75. Defendants and Plaintiffs entered into the Construction Agreement, which is a valid and enforceable contract between them.

76. Plaintiffs performed all of their obligations under the agreement as set forth above, including by paying CCC the initial $32,350 down payment.

77. Inherent in each contract in the state of Utah is an implied covenant of good faith and fair dealing.

78. Defendants were obligated not to destroy or injure Plaintiffs' right to receive the fruits of the Construction Agreement.

79. Defendants' conduct, including by failing to complete construction on the Property in a reasonable time, was inconsistent with the agreed-upon common purpose of the Construction Agreement and Plaintiffs' justified expectations.

80. Defendants' actions, including by failing to complete the work under the Construction Agreement in a reasonable period of time or to complete the work in a

workmanlike manner, constitute material breaches of Defendants' obligation of good faith and fair dealing owed to Plaintiffs under the Construction Agreement.

81.     As a direct and proximate cause of the breach of implied covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount to be proven at trial, but in amount exceeding $99,087.87, and, to the extent applicable, interest, costs, and attorney fees.

## THIRD CAUSE OF ACTION
### (Negligence)

82.     Plaintiffs hereby incorporate by reference the allegations contained in the above paragraphs.

83.     Defendants had a duty not to damage Plaintiffs' Property while they were on the Property and performing work on the Property.

84.     Defendants breached their duty to Plaintiffs by damaging the deck piers and septic tank on the Property and leaving Plaintiffs' exterior logs uncovered and exposed to the elements.

85.     Defendants' actions in hitting the deck piers and moving rocks onto the septic tank caused damage to Plaintiffs' Property.

86.     Defendants' actions in leaving the exterior logs uncovered and exposed to the elements such as snow and rain, caused damage to Plaintiffs' Property.

87.     As a direct and proximate cause of Defendants' breaches of their duties to Plaintiffs, Plaintiffs have been damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

88.     Plaintiffs hereby incorporate by reference the allegations contained in the above paragraphs.

89.     Plaintiffs conferred benefits upon Defendants, including by paying Defendants monies for removal of snow and other work that was not covered under the Construction Agreement nor contemplated under the Construction Agreement.

90.     Defendants accepted the benefits conferred by Plaintiffs and appreciated the value of the benefits conferred on Defendants by Plaintiffs.

91.     Despite receiving and appreciating the aforementioned benefits, Defendants performed work that was not authorized by Plaintiffs, was wholly unnecessary and/or was performed incorrectly causing damage to Plaintiffs' Property, resulting in Defendant being unjustly enriched to Plaintiffs' detriment based on Defendants' receipt of payment.

92.     It would be inequitable for Defendants to retain the aforementioned benefits without compensating Plaintiffs for the benefits conferred.

93.     As a direct and proximate result of Defendants being unjustly enriched, Plaintiffs are entitled to disgorgement of the amounts paid to Defendants in a sum to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court enter judgment against Defendants as follows:

I.      Judgment in favor of Plaintiffs and against Defendants in an amount to be proven at trial, but not less than $99,087.87,

II.     Pre- and post-judgment interest,

III.    Costs and expenses, including reasonable attorney fees to the extent allowed by law; and

IV.     For such other and further relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues herein so triable.

DATED this 28th day of January, 2020.

MCNEILL | VON MAACK

/s/ Kennedy D. Nate
Jason A. McNeill
Kennedy D. Nate
*Attorneys for Plaintiffs Ron and Donna Ingram*

# Exhibit 1

(Construction Agreement)

# Chris Copeland Construction Inc. & Sons.

Cedar City, Utah. 84721
435-590-5245
chriskcopeland@yahoo.com

November 04, 2018

Mr. Ron Ingram & Mrs. Donna Ingram
3750 North, Movie Ranch Rd.
Duck Creek, Utah.
702-810-2568 ( Ron )
702-325-2568 ( Donna )

Proposal:

For labor, tools, pneumatic nails / staples, and forklift / crane services.
TotCost: $64,700.00
Terms of service:
50% down up to 14 days prior to beginning project $32,350.00    Pd.
25% when 2nd floor is in place. $16,175.00
25% when project is complete. $16,175.00
Total Cost: $64,700.00

*Chris Copeland*

# Chris Copeland Construction Inc. & Sons.

*Thank you for your business we really appreciate it!!*



# Chris Copeland Construction Inc. & Sons.

Cedar City, Utah. 84721
435-590-5245
chriskcopeland@yahoo.com

November 04, 2018

Mr. Ron Ingram & Mrs. Donna Ingram
3750 North, Movie Ranch Rd.
Duck Creek, Utah.
702-810-2568 ( Ron )
702-325-2568 ( Donna )

Proposal:

For rough framing by CCC Inc. & Sons.- basement walls, first floor and walls, loft floor and walls, roof framing, posts, beams, and decks.
stacking of log kit, labor, tools, pneumatic nails / staples, and forklift services.

Terms of service:
50% down up to 14 days prior to beginning project $32,350.00
25% when 2nd floor is in place. $16,175.00
25% when project is complete. $16,175.00
Total Cost: $64,700.00

Any questions please call, text, or email.

*Chris Copeland*

# Chris Copeland Construction Inc. & Sons.

*Thank you for your business we really appreciate it!!*

Print Name: ___Ronald L. Ingram___ Owner/s

Sign Name: ___Ronald L. Ingram___

Print Name: ___Donna J. Ingram___ Contractor

Sign Name: ___Donna J. Ingram___

Any changes may result in additional fees, restrictions may apply for working conditions.
In the case of snow removal CCC Inc. & Sons. may charge an extra removal fee per employee and or equipment needed.( up to $30 per hour per employee, and $100 per hour per piece of equipment. )
CCC Inc. & Sons. will delay  work if roads are impassable to get to the project until roads are clear. Safety is a goal of CCC Inc. & Sons.
All building materials, adhesives, bolts, and hardware will be provided by the homeowner or the supplier provided by the homeowner.

# Exhibit 2

(7-2-19 Letter R. and D. Ingram to C. Copeland
("July Letter"))

September 7, 2019

Chris Copeland Construction, Inc. & Sons
2551 W. 3750 N
Cedar City, UT 84721

Mr. Copeland:

Effective immediately we no longer require your services to continue building our log home. Next month it will be a year since we first met and agreed with you to build our log home and you have continually made broken promises, refused to respond to text messages & return phone calls. Your mobile phone is constantly full, so we cannot even leave a message. Last week you said you would be at our property with four additional workers to get things moving and you came on Friday, with one man at 1:30 PM and left at 3:30PM, which has been your schedule for most of the summer. We have been very patient until now, but your lack of interest and dedication to this project is a clear indication that you have failed to perform in a timely manner.

Furthermore, we have met with another builder, who has advised us that we may need to remove one or more of the support walls that you partially framed in the basement because they will not hold the weight of the logs and will not pass inspection. We cannot have those walls go up any further and then have to remove the logs that are stacked on top of these support walls. This is a clear indication that you have failed to properly construct the very support of the structure.

Our new builder will begin work next week to start making corrections and stacking the rest of the logs. Your have clearly not completed ½ of the job for which you have been paid.

Please make arrangements to remove your construction equipment and belongings by no later than Wednesday September 11th. and return all of the materials that you have been given by Oscar, including the fasteners you have locked up in your Conex box. Our property has been nothing but a storage facility for your equipment, of which you rarely used there, but instead you would pick up what you needed to use on other jobs and return them for storage, once again.

It is with regret that we feel obligated to ask you to remove your equipment and cease & desist working on our property.

Ron & Donna Ingram
P.O. Box 92944
Henderson, NV 89009
702-810-2568

CC: Oscar Hulet – Mailed 9/7/2019, Priority Mail & Emailed

# Exhibit 3

(9-7-19 Letter R. and D. Ingram to C. Copeland (the "Termination Letter"))

July 2, 2019

Chris Copeland Construction, Inc. & Sons
2551 W. 3750 N
Cedar City, UT 84721

Mr. Copeland:

On November 4, 2018 we entered an agreement with you to begin the second phase
of construction on our log home. We promptly wired you $32,350 for you
to begin working. In the beginning, you seemed eager and started framing the
basement and began installing the sub-floor to the first story. It is now almost 8
months later and the job is still not complete.

On 12/9/2018, you billed us for some additional work, which you were not
contracted to do, in the amount of $13,558.87. On 1/27/2019 you sent us a bill for
snow removal for $3085.00, for 4 days, again you were not authorized to do this
snow removal. We feel this bill was excessive, due to your use of improper
equipment, causing you to spend more time than would have been necessary had
you used the right equipment. And why remove snow when you never showed back
up to do any more work? When you removed the snow you ran into the stacks of
lumber, breaking many of the pieces and threw rocks and dirt on top of the stacks.
Additionally, you in pushed many large heavy rocks into the septic tank hole, on top
of the septic tank that was in, but not yet buried.

We have since asked you to give us estimates prior to commencement for future
additional expenses and to receive authorization from us prior to beginning any
further non-contracted work. Additionally, we had the snow removed several times
after that, by others, in anticipation of you returning to work, yet nothing further
was completed by you or your employees, during that time. Furthermore, it hardly
cost us a fraction of what you charged for the additional snow removal. And we
have seen little progress since.

The weather and abundance of water certainly has been a factor in continuing this
project for some time, but for well over a month that has not been a valid excuse.
You have repeatedly committed to being on the job and no one has shown up. We
have sent you numerous text messages and repeatedly called and we receive no
response. The excuse, for your lack of response, is that you don't have good service
on the mountain, but you don't live on the mountain and that means unless you
spend all of your time here, you must be getting those messages once you leave. If
someone does show up, it is after noon and not a full days work has been completed,
since last year. Last Thursday you personally came after noon, spent about four
hours, and Ron helped you put down some of the subfloor, because you came by
yourself. You said you would be back Friday and you did not come back. Ron has
health issues and should not be up on a roof, but he is so distraught by you not
showing up and me being upset, that he is trying to encourage you to get this done.

The job site looked absolutely atrocious, water bottles, pop cans, food & trash, were just thrown about and no one ever bothered to clean up. The pieces of trash from the under slab plumbing, were just thrown over by the Conex box. If trash bags were something you needed, why not ask? We have spent countless hours just cleaning up. We now have a dumpster and have hired someone to come and bring in dirt, and raise the driveway to make it easier to access the building site. This we have done, on our own, without direction or a request from you.

Our logs & lumber have been sitting outside in the elements, not properly covered, for months and nothing has been accomplished. Many of it has been ruined and it just doesn't make any sense. What is the excuse for not getting this project done?

We have seen on Facebook that you are doing other jobs. Why is our job so unimportant to you, that you do these other jobs, when you committed to do our job first? Have the other people you are working for, already paid over $32,000 for you to begin work?

The bank is now pressing us to get this phase of the job complete. If we do not have it done by the end of July, they are going to begin penalizing us. We **cannot** afford to have that happen. We have been advised to contact an attorney and the contractors board, which we really don't want do to, but unless we can get a firm commitment from you, we will be forced to so. This is our dream home and it has now become a nightmare. We are both sorry we ever started this project. But at this point, we are so far invested in this job, that we can't turn back now. Every delay costs us more and threatens our commitments to others.

It has been our experience that saying nothing does not accomplish anything, so we are asking you to begin communicating and move forward according to our agreement. When we met with you, in April 6th, you said you could have the logs up in two weeks, once you got started. We are asking for you to do the right thing and please get it done. We look forward to you moving forward, getting the job complete, and not having any further delays. If we don't hear from you by July 7th, we will consider, by your lack of action, that you will not be continuing the job, we will expect you to return our deposit, and we will pursue further actions.

Regretfully,

Ron & Donna Ingram
P.O. Box 92944
Henderson, NV  89009
Ron 702-810-2568
Donna 702-325-2568
Email: formymgmt@aol.com
CC: Oscar Hulet - Mailed 7/2/2019, Certificate of Mailing as Proof & Emailed